IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                      No. CR 15-3253 JB

JUANITA ROIBAL-BRADLEY,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Juanita Roibal-Bradley's *Sealed* Sentencing Memorandum at 1, filed August 24, 2016 (Doc. 44)("PSR Objections"). The Court held a sentencing hearing on September 12, 2016, and restitution hearings on December 2, 2016, and December 5, 2016. The primary issues are whether the Court should, pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A ("MVRA"), order Roibal-Bradley to pay restitution: (i) to Joseph K. Swezey Jr. in the amount of $90,772.44, for fees J. Swezey paid to RFM Research, LLC, and Jackson Kelly, PLLC, to assist in recovering his inheritance; and (ii) to Tina R. Swezey in the amount of $20,135.51, for fees T. Swezey paid to RFM Research to assist in recovering portions of her inheritance. The Court overrules Roibal-Bradley's objections and imposes the recommended restitution awards, because Roibal-Bradley's conduct actually caused the Swezeys to retain the services of RFM Research and Jackson Kelly, and because a preponderance of the evidence supports the award amounts.

## FACTUAL BACKGROUND

In a Plea Agreement, filed February 2, 2016 (Doc. 29)("Plea Agreement"), Roibal-Bradley admitted the following facts. Regarding Count I of the Indictment, filed September 10, 2015 (Doc.

1)("Indictment"), which charges Roibal-Bradley with fraudulently receiving Social Security

Disability Insurance Benefits to which she was not entitled, in violation of 42 U.S.C. § 408(a)(4)(1),

see Indictment ¶¶ 1-2, at 1-2, Roibal-Bradley admitted:

> Between on or about September 18, 2007, and continuing through on or about March 23, 2011, in the District of New Mexico and elsewhere, I had knowledge of an event affecting my initial and continuing right to any payment of Social Security Disability Insurance Benefits, and I knowingly failed to disclose this event to the Social Security Administration, with the intent to fraudulently secure payment in a greater amount than was due and when no payment was authorized. . . .

> On or about September 18, 2007, I submitted an application to the Social Security Administration for Disability Insurance Payments.  As  part of the application process, I claimed that my disability prevented me from engaging in any work. Based on my representations that I was not capable of gainful employment, on March 25, 2008, the Social Security Administration began paying me disability benefits, and continued to pay me such benefits until March 23, 2001.  During the entire time I was receiving Social Security Disability Insurance Payments, I was working full-time as a mediator or supervising attorney at the New Mexico Worker's Compensation Administration and I did conceal and fail to disclose to the Social Security Administration that I was capable of such full-time, gainful employment.

> As a result of my failure to disclose to the Social Security Administration my ability to engage in full-time work, I fraudulently received Social Security Disability Insurance Benefits to which I was not entitled, in an amount in excess of $40,000.

Plea Agreement ¶¶ 9.a-9.c, at 4-5 (paragraph numbering omitted).  Regarding Counts II through XIII

of the Indictment, which charge Roibal-Bradley with devising and executing a wire fraud scheme

and artifice to defraud the Estate of Joseph King Swezey Sr. of more than $250,000.00, in violation

of 18 U.S.C. § 1343, see Indictment ¶¶ 1-7, at 2-4, Roibal-Bradley admitted:

> Between or about March 19, 2012, and on or about June 30, 2013, in the District of New Mexico and elsewhere, I knowingly and with intent to defraud devised and executed a scheme and artifice to defraud individuals and the Estate of J.S., and to obtain money from individuals and the Estate of J.S. by false and fraudulent pretenses, representations, and promises, and, for the purpose of executing my scheme and artifice, caused writings and signals to be transmitted in interstate commerce via wire. . . .

> On March 19, 2012, J.S. passed away.  One of J.S.'s daughters was named administrator of his estate.  In addition to the administrator, J.S. was survived by

another daughter and a son.  J.S.'s estate was worth at least $850,000 and was to be split equally among his three children.  Instead, I devised and executed a wire fraud scheme and artifice wherein I defrauded the Estate of J.S. of an amount in excess of $250,000.

The administrator knew that I had been a licensed attorney in New Mexico.  The administrator did not know that I was not permitted to practice law, having been suspended from the practice of law by the New Mexico Supreme Court, and specifically ordered to "not engage in the private practice of law nor accept any fees for legal services whatsoever."

I did not tell the administrator that I was not allowed to be a lawyer and I held myself out as an attorney to the administrator.  I prepared an attorney engagement agreement on the letterhead I used when I was authorized to practice law, "Juanita Roibal Law Offices," and I had the administrator sign that agreement.  Under the terms of that agreement, I was to provide legal services to the Estate of J.S., including locating and distributing the estate's assets.

I did participate in locating the assets of the Estate of J.S.  The administrator received the assets her father had left to her.

In executing my scheme and artifice to defraud, I had the administrator transfer in interstate commerce by wire the remaining assets of the Estate of J.S. from financial institutions located outside of New Mexico to a personal account I held at U.S. New Mexico Federal Credit Union in New Mexico.  In all, between April 18, 2012, and August 15, 2012, I had the administrator deposit into my personal account 11 wire transfers totaling $571,948.98.  The administrator wire transferred the estate's assets to me based on my representations that I, in my purported role as attorney for the estate, would distribute the fund to J.S.'s rightful heirs, the administrator's brother and sister.

I did distribute some of the estate's assets to the administrator's sister and brother but instead of distributing the rest of the estate's assets to their rightful owners, the administrator's brother and sister, I withdrew some of the estate's assets from my credit union account for my personal use.  In all, I stole in excess of $250,000 from the estate and its heirs. . . .

On or about the following dates in 2012: April 18, April 27, May 3, May 10, May 11, June 20, June 26, July 6, July 20, July 23, and August 15, I executed my scheme and artifice by knowingly and with intent to defraud, causing the administrator of the Estate of J.S. to transfer in interstate commerce by wire $571,948.98 of the estate's assets from financial institutions located outside of New Mexico to my personal accounts at U.S. New Mexico Federal Credit Union in New Mexico.  Instead of distributing those assets to the estate's rightful heirs, I defrauded the estate of an amount in excess of $250,000 and put those stolen assets to my own use.

Additionally, on or about June 7, 2013, I engaged in a telephone conversation, via interstate wire, with J.S.'s son, during which I attempted to deter the son from alerting authorities or taking legal action by falsely claiming I was entitled to invest the funds, that I had invested the funds, and that I would distribute the funds as requested.

Plea Agreement ¶¶ 9.d-9.l, at 5-7 (paragraph numbering omitted).

## PROCEDURAL BACKGROUND

On September 10, 2015, a grand jury returned a twenty-three count indictment against Roibal-Bradley. See Indictment at 1-8. Count I charges Roibal-Bradley with fraudulently receiving Social Security Disability Insurance Benefits to which she was not entitled, in violation of 42 U.S.C. § 408(a)(4)(1). See Indictment ¶¶ 1-2, at 1-2. Counts II through XIII charge Roibal-Bradley with devising and executing a wire fraud scheme and artifice to defraud the Estate of Joseph King Swezey Sr. of more than $250,000.00, in violation of 18 U.S.C. § 1343. See Indictment ¶¶ 1-7, at 2-4. Counts XIV through XXIII charge Roibal-Bradley with knowingly engaging in a series of monetary transactions in property criminally derived from wire fraud worth more than $10,000.00. See Indictment ¶ 1, at 4-5. On February 2, 2016, pursuant to a plea agreement, Roibal-Bradley entered guilty pleas as to Counts I through XIII. See Plea Agreement at 1-11.

The United States filed a Presentence Investigation Report on June 17, 2016. See Presentence Investigation Report at 1, filed June 17, 2016 (Doc. 34)("PSR"). In the PSR, the United States recommends that the Court award restitution to J. Swezey, Joseph King Swezey Sr.'s son, in the amount of $90,772.44, and restitution to T. Swezey, Joseph King Swezey Sr.'s daughter, in an unspecified amount. See PSR ¶ 81, at 19. The United States subsequently filed a Supplemental Memorandum recommending restitution to T. Swezey in the amount of $20,135.51. See Supplemental Memorandum at 1, filed November 18, 2016 (Doc. 84)("Suppl. Memo"). Both award amounts purportedly reflect payments that the Swezeys made to RFM Research and Jackson Kelley

for assistance in recovering inheritance money which Roibal-Bradley, acting as attorney for the estate of the Swezeys' father, fraudulently caused to be wired into her personal checking account. See United States' Response to Defendant's Objections and Sentencing Memorandum at 5, filed August 31, 2016 (Doc. 46)("PSR Response").

Roibal-Bradley filed a sentencing memorandum objecting to the PSR's recommended restitution awards on August 24, 2016. See PSR Objections at 1. Roibal-Bradley disputes the PSR's recommendations and "demands proof of such." PSR Objections at 1. Roibal-Bradley contends that the Disciplinary Board of the Supreme Court of New Mexico already effectuated full restitution to the Swezeys, and that RFM Research and Jackson Kelly's efforts on the Swezeys' behalf "have not been correlated to the result, in terms of payment of restitution, and what [they] actually did for the money." PSR Objections at 2.

The United States responded to Roibal-Bradley's PSR Objections on August 31, 2016. See PSR Response at 1. The United States contends that "'[t]he MVRA expressly contemplates reimbursement for 'expenses incurred during participation in the investigation . . . of the offense . . . .'" PSR Response at 5 (quoting 18 U.S.C. § 3663A(b)(4)). The United States asserts that "[t]his is exactly the type of expense incurred by the S. Estate heirs when they paid approximately $91,000 to RFM Research LLC (RFM) and Jackson-Kelly to assist them in recovering their inheritance." PSR Response at 5. The United States argues that "the S. Estate heirs would not have needed to expend this money if Ms. Roibal-Bradley ha[d] disbursed their inheritance as demanded by law, professional rules of conduct, and basic human decency." PSR Response at 5. Finally, responding to Roibal-Bradley's argument that the Disciplinary Board of the Supreme Court of New Mexico accomplished full restitution, the United States contends that "the fact that the S. Estate heirs did not obtain

repayment of this money as part of the New Mexico Disciplinary Board proceedings does not mean that they are not entitled to it as part of these criminal proceedings." PSR Response at 6.

Roibal-Bradley replied on September 6, 2016. See Sealed Reply to United States' Response to Defendant's Objections and Sentencing Memorandum at 1, filed September 6, 2016 (Doc. 49)("PSR Reply"). Roibal-Bradley's primary argument is that "it seems that the amounts sought to be charged to Ms. Bradley are grossly excessive for the work performed." Sealed Reply to United States' Response to Defendant's Objections and Sentencing Memorandum at 2-3, filed September 6, 2016 (Doc. 49)("PSR Reply"). She contends that RFM Research's statement that a one-third contingency fee is the "'industry standard' for recovery of estate assets is completely unsupported." PSR Reply at 2. She presses that the "New Mexico Disciplinary Board . . . and the Supreme Court were the entities, which actually obtained the estate monies back, and not RFM or Jackson-Kelly." PSR Reply at 2. Roibal-Bradley concedes that "expenses incurred in the investigation of the offense are recoverable," but asserts that "[t]he services actually performed . . . appear to be $5,000 or less of actual work even at an hourly rate of $300-$500." PSR Reply at 2-3. Accordingly, Roibal-Bradley "requests this Court order a reasonable amount of expenses for collection owing, but not the $90,000 amount." PSR Reply at 3.

## ANALYSIS

"Courts have no inherent power to order restitution; they may only do so as authorized by statute." United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007). The MVRA enumerates several categories of offenses and authorizes restitution in "sentencing proceedings for convictions of, or plea agreements, relating to charges for" offenses in those categories, where "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). The United States Court of Appeals for the Tenth Circuit has stated that "the principal aim of []

Case 1:15-cr-03253-JB   Document 89   Filed 12/06/16   Page 7 of 12

restitution is to ensure that crime victims, to the extent possible, are made whole for their losses."
United States v. Ferdman, 779 F.3d 1129, 1132 (10th Cir. 2015)(citing United States v. James, 564
F.3d 1237, 1246 (10th Cir. 2009)).  See Paroline v. United States, 134 S. Ct. 1710, 1726 (2014)("The
primary goal of restitution is remedial or compensatory.")(citation omitted).  Accordingly, an order
of restitution aims to "restor[e] victims to the position they occupied before the crime" and not
"unjustly enrich crime victims or provide them a windfall."  United States v. Ferdman, 779 F.3d at
1132 (citing Hughey v. United States, 495 U.S. 411, 416 (1990)).

The MVRA authorizes restitution in this case.  Pursuant to § 3663A(c)(1)(A)(ii), restitution
is mandatory for "any offense committed by fraud or deceit."  Further, the Swezeys are "identifiable
. . . victims [who] suffered a physical injury or pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  Thus,
the issue is whether the PSR's recommended awards are appropriate.

An order of restitution imposed under the MVRA cannot "provide incidental, consequential,
or pain and suffering awards," but only awards for losses "actually caused by the defendant's
offense."  United States v. Shengyang Zhou, 717 F.3d 1139, 1154 (10th Cir. 2013)(internal quotation
marks and citations omitted).  See United States v. Gordon, 480 F.3d at 1211 (stating that
"restitution may only be ordered for losses caused by the offense of conviction"); United States v.
Quarrell, 310 F.3d 664, 680 (10th Cir. 2002)("A restitution order must be based on *actual*
loss.")(emphasis in original).  Accordingly, in considering "whether a defendant is required to pay
restitution under the MVRA the district court must determine [] whether the crime of conviction or
plea . . . was the proximate cause of the damage."  United States v. West, 646 F.3d 745, 751 (10th
Cir. 2011).  The Tenth Circuit has stated that the causation inquiry centers on "'whether there was an
intervening cause and, if so, whether this intervening cause was directly related to the offense

- 7 -

conduct.'" United States v. Speakman, 594 F.3d 1165, 1172 (10th Cir. 2010)(quoting United States

v. Wilfong, 551 F.3d 1182, 1187 (10th Cir. 2008)).

      Here, the PSR recommends restitution only for losses "actually caused," United States v.

Shengyang Zhou, 717 F.3d at 1154, by Roibal-Bradley's offense.  But for Roibal-Bradley's theft of

the Swezeys' inheritance money, they would not have needed to retain RFM Research's and Jackson

Kelley's services, thereby incurring the one-third contingency fee.  The recommended awards reflect

only the actual loss of that contingency fee, not any "incidental, consequential, or pain and suffering

awards."  United States v. Shengyang Zhou, 717 F.3d at 1154.  See PSR Response at 5 (stating that

RFM Research and Jackson Kelly charged J. Swezey roughly $91,000.00 "to assist them in

recovering their inheritance"); Suppl. Memo at 1 (stating that T. Swezey paid roughly $20,000.00 to

RFM Research to regain portions of her inheritance).  Further, the Swezeys' hiring of RFM Research

and Jackson Kelly is not an intervening cause, see United States v. Speakman, 594 F.3d at 1172,

because the MVRA expressly provides for reimbursement for "expenses incurred during

participation in the investigation or prosecution of the offense," 18 U.S.C. § 3663A(b)(4).

Regardless, even if hiring RFM Research and Jackson Kelly was an intervening cause, the hiring

was "directly related to the offense conduct."  United States v. Speakman, 594 F.3d at 1172 (internal

quotation marks and citation omitted).

      Roibal-Bradley disputes none of this analysis.  Indeed, she concedes that "expenses incurred

in the investigation of the offense are recoverable . . . ."  PSR Reply at 2.  Roibal-Bradley's main

objection to the PSR's recommended restitution awards is that the "amounts sought to be charged . .

. are grossly excessive for the work performed."  PSR Reply at 2-3.  She presses that RFM

Research's assertion "that a 1/3 contingency fee is the 'industry standard' for recovery of estate

assets is completely unsupported" and that "[t]he services actually performed by these entities . . .

- 8 -

appear to be $5,000 or less of actual work even at an hourly rate of $300-$500." PSR Reply at 2-3. Thus, "she objects to the [PSR's] restitution amount, and requests this Court order a reasonable amount of expenses for collection owing, but not in the $90,000 amount." PSR Reply at 3.

Section 3664 of Title 18 of the United States Code governs a district court's issuance and enforcement of an order of restitution under the MVRA. See 18 U.S.C. § 3663A(d). Pursuant to § 3664(e), "[a]ny dispute as to the proper amount . . . of restitution shall be resolved by the court by a preponderance of the evidence. The burden of demonstrating the amount of loss sustained by the victim as a result of the offense shall be on . . . the Government." The Tenth Circuit has cautioned that the district court cannot "simply 'rubber stamp' a victim's claim of loss based upon a measure of value unsupported by the evidence." United States v. Ferdman, 779 F.3d at 1133. Still, the MVRA does not require a district court to calculate a victim's loss with "exact" precision, United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009), and "[a] district court 'may resolve restitution uncertainties with a view towards achieving fairness to the victim so long as it still makes a reasonable determination of appropriate restitution *rooted in a calculation of actual loss*,'" United States v. Ferdman, 779 F.3d at 1133 (quoting United States v. Gallant, 537 F.3d 1202, 1252 (10th Cir. 2008))(emphasis in United States v. Ferdman but not in United States v. Gallant).

Here, a "preponderance of the evidence," 18 U.S.C. § 3664(e), supports the PSR's recommended restitution amounts. The Swezeys assigned to RFM Research one-third of their inheritance shares in exchange for RFM Research's assistance in reclaiming their funds. See Summary of Services and Actions by RFM Research LLC in the Estate Case of Joseph King Swezey Sr. at 1, filed August 31, 2016 (Doc. 46-1)("RFM Summary"). Jackson Kelley and RFM Research had a separate agreement, whereby Jackson Kelly would receive ten percent of RFM Research's one-third contingency fee. See RFM Summary at 1; Contingency Fee Agreement with Jackson

Kelly PLLC at 1-4, filed August 11, 2016 (Doc. 41-4).  From February 2012 to May 2015, RFM

Research researched probate records, searched for and located Joseph King Swezey Sr.'s heirs,

investigated Joseph King Swezey Sr.'s estate, contacted the Disciplinary Board of the Supreme

Court of New Mexico which disbarred Roibal-Bradley and ordered her to make restitution, and

worked with Roibal-Bradley's attorney to effect restitution.  See RFM Summary at 1.  RFM

Research notes that the industry standard contingency fee for similar work is "one-third of the assets

recovered," and that "[t]his case was more complicated as it also involved an Administratrix, who

did not perform her duties, action by the Disciplinary Board and protracted recovery of the assets

from T. Roibal-Bradley."  RFM Summary at 2.

        Roibal-Bradley objects that there is no evidence that a "1/3 contingency fee is the 'industry

standard'" for such work.  PSR Reply at 1.  The Court disagrees.  Genealogical "heir finders" such

as RFM Research routinely "attempt to collect contingency fees as high as 50 per cent from estate or

trust beneficiaries or the estates or trusts themselves."  Michael S. Ramage, *Fees and Forensic

Geneology*, Forensic Genealogy News (Dec. 2011).  See Allan Friedman, Heir-Hunting Agreements:

Recommendations for the Extension of Probate Court Jurisdiction, 6 Conn. Prob. L.J. 87, 90

(1991)(stating that heir finders typically take twenty-five to fifty percent of the inheritance); In re

Estate of Maxson, 413 N.Y.S.2d 676, 677 (1979)(noting that an heir finder, upon finding such heirs,

"reveals their good fortune . . . on their agreement to compensate him, usually in the amount of 50%

of their inheritance").  Many courts uphold such fees.  See, e.g., Sparne v. Altshuler, 80 R.I. 96, 90

A.2d 919 (1952)(upholding one-third contingency fee agreement in consideration for providing

genealogical information to establish plaintiff's right to inheritance); Estate of Katze-Miller v. Int'l

Equity Research, 158 Wis. 2d 559, 463 N.W.2d 853 (Ct. App. 1990)(upholding genealogical

heirship search and investigative/attorney services in exchange for forty percent interest in heirs'

distributive shares); Jones v. Walker, 660 A.2d 76, 78 & n. 4 (Pa. Super. 1995)(noting that a firm

received thirty-five percent of inheritance after contacting three paternal cousins who were missing

heirs to the estate); Nelson v. McGoldrick, 896 P. 2d 1258, 1260 (1995)(holding that an agreement

which refused to give any information to enable an heir to locate property unless she promised to

give the finder fifty percent of the estate was not illegal or void as against public policy).  Some

courts subject these fees to a discretionary reasonableness standard, meaning that the court examines

the amount of time and effort that the firm expended while considering the success of the firms'

work.  See, e.g., Estate of Atkinson, 7 Phila. 106 (1981); In re Devlin, 182 A.D.2d 322, 588

N.Y.S.2d 316 (App. Div. 1992).

Taking the above cases as guidance, the Court concludes that RFM Research's one-third

contingency fee for three years' work to successfully recover the Swezeys' inheritance was

reasonable and not "grossly excessive" as Roibal-Bradley insists. PSR Reply at 2.  Accordingly, the

Court concludes that, pursuant to MVRA § 3663A, Roibal Bradley must pay restitution to J. Swezey

in the amount of $90,772.44 and restitution to T. Swezey in the amount of $20,135.51.  The Court

notes that these awards, which are "rooted in a calculation of actual loss," are imposed "with a view

towards achieving fairness to the victim[s]." United States v. Ferdman, 779 F.3d at 1133 (emphasis

and citation omitted).

**IT IS ORDERED** that: (i) Roibal-Bradley's objections to the PSR's recommended

restitution awards to J. Swezey and T. Swezey in Defendant Juanita Roibal-Bradley's *Sealed*

Sentencing Memorandum at 1, filed August 24, 2016 (Doc. 44), are overruled; and (ii) Roibal-

Bradley must pay restitution to J. Swezey in the amount of $90,772.44 and restitution to T. Swezey

in the amount of $20,135.51.

- 12 -

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Holland S. Kastrin
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

> *Attorneys for the Plaintiff United States of America*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

-- and --

Barrett (Barry) George Porter
Burgess and Porter Law, LLC
Albuquerque, New Mexico

> *Attorneys for the Defendant*